Slip Op. 18-63

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OMG, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> MID CONTINENT STEEL & WIRE INC., <br><br> Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br><br> Court No. 17-00036 |

## **OPINION**

[Commerce's Final Results are remanded and plaintiff's motion for judgment on the agency record is granted in part.]

Dated: May 29, 2018

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for plaintiff. With him on the brief were David M. Murphy and Andrew T. Schutz.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel was Nikki Kalbing, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Adam Gordon, The Bristol Group PLLC, of Washington, DC, argued for defendant-intervenor. With him on the brief was Ping Gong.

Katzmann, Judge:  A prominent psychologist once suggested that it must be tempting "if the only tool you have is a hammer, to treat everything as if it were a nail." ABRAHAM MASLOW, PSYCHOLOGY OF SCIENCE: A RECONNAISSANCE 15–16 (1966).  Plaintiff OMG, Inc. ("OMG") believes that the Department of Commerce ("Commerce") made such an error, and challenges Commerce's determination that zinc anchors imported by OMG fall within the scope of the Antidumping and Countervailing Duty Orders on Certain Steel Nails from the Socialist Republic of Vietnam.  Certain Steel Nails from the Socialist Republic of Vietnam: Final Scope Ruling on OMG, Inc.'s Zinc Anchors (Feb. 6, 2017), P.D. 29 ("Final Scope Ruling"); Certain Steel Nails from the Socialist Republic of Vietnam: Countervailing Duty Order, 80 Fed. Reg. 41,006 (July 14, 2015) and Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 80 Fed. Reg. 39,994 (July 13, 2015) (collectively the "Orders").  OMG argues that its anchors are not steel nails and, therefore, do not fall within the scope of the orders and that Commerce's analysis and scope determination is unsupported by substantial evidence on the record and is otherwise not in accordance with law.  Compl., Feb. 21, 2017, ECF No. 7; Pl.'s Mot. For J. on the Agency R. and Br. in Supp., June 29, 2017, ECF No. 26 ("Pl.'s Br."); Pl's Reply, Nov. 30, 2017, ECF No. 34.  The court concludes that Commerce's determination was not in accordance with law, for the reasons stated below.

**BACKGROUND**

**A.    Legal and Regulatory Framework of Scope Reviews Generally.**

Dumping occurs when a foreign company sells a product in the United States for less than fair value -- that is, for a lower price than in its home market.  Huzhou Muyun Wood Co., Ltd. v. United States, 42 CIT ___, ___, 279 F. Supp. 3d 1215, 1218 (2017) (citing Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012)).  Similarly, a foreign country may

countervailably subsidize a product and thus artificially lower its price. U.S. Steel Grp. v. United States, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996). To empower Commerce to offset economic distortions caused by dumping and countervailable subsidies, Congress enacted the Tariff Act of 1930.[1] Huzhou, 279 F. Supp. 3d at 1218–19. Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential dumping or subsidies and, if appropriate, issue orders imposing duties on the subject merchandise. Id.

In order to provide producers and importers with notice as to whether their products fall within the scope of an antidumping or countervailing duty order, Congress has authorized Commerce to issue scope rulings clarifying "whether a particular type of merchandise is within the class or kind of merchandise described in an existing . . . order." 19 U.S.C. § 1516a(a)(2)(B)(vi). As "no specific statutory provision govern[s] the interpretation of the scope of antidumping or countervailing orders," Commerce and the courts developed a three-step analysis. Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1354 (Fed. Cir. 2015); Polites v. United States, 35 CIT ___, ___, 755 F. Supp. 2d 1352, 1354 (2011); 19 C.F.R. § 351.225(k).

Because "[t]he language of the order determines the scope of an antidumping duty order[,]" any scope ruling begins with an examination of the language of the order at issue. Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005) (citing Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). If the terms of the order are unambiguous, then those terms govern. Id. at 1382–83.

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

However, if Commerce determines that the terms of the order are either ambiguous or reasonably subject to interpretation, then Commerce "will take into account . . . the descriptions of the merchandise contained in the petition, the initial investigation, and [prior] determinations [of Commerce] (including prior scope determinations) and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1) ("(k)(1) sources"); Polites, 755 F. Supp. 2d at 1354; Meridian Prod., LLC v. United States, 851 F.3d 1375, 1382 (Fed. Cir. 2017). To be dispositive, the (k)(1) sources "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question." Polites, 755 F. Supp. 2d at 1354 (quoting Sango Int'l v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007)). If Commerce "can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of . . . section [351.225], whether a product is included within the scope of an order . . . [Commerce] will issue a final ruling[.]" 19 C.F.R. § 351.225(d).

If a section 351.225(k)(1) analysis is not dispositive, Commerce will initiate a scope inquiry under § 351.225(e), and apply the five criteria from Diversified Prods. Corp. v. United States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983) as codified in 19 C.F.R. § 351.225(k)(2).[2] Polites, 755 F. Supp. 2d at 1355.

B.  **Factual and Procedural History of this Case**

In May 2014, Mid Continent Steel & Wire ("Mid Continent") petitioned Commerce to impose antidumping and countervailing duties on steel nails from a number of countries, including the Socialist Republic of Vietnam ("Vietnam"). Certain Steel Nails from the Socialist Republic of Vietnam: OMG Scope Request: Zinc Anchors ("Scope Ruling Request") at Ex. 10, Petition for

---

[2] These criteria are: (1) The physical characteristics of the product, (2) the expectations of the ultimate purchasers, (3) the ultimate use of the product, (4) the channels of trade in which the product is sold, and (5) the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2); see Diversified Prods., 572 F. Supp. at 889.

the Imposition of Antidumping and Countervailing Duties, P.D. 1–5 (May 29, 2014). In July 2015, after having determined that dumping was occurring, Commerce issued the antidumping and countervailing duty <u>Orders</u> covering certain steel nails from Vietnam. The scope of the <u>Orders</u> reads in full:

> The merchandise covered by the Orders is certain steel nails having a nominal shaft length not exceeding 12 inches. Certain steel nails include, but are not limited to, nails made from round wire and nails that are cut from flat-rolled steel. <u>Certain steel nails may consist of a one piece construction or be constructed of two or more pieces. Certain steel nails may be produced from any type of steel, and may have any type of surface finish, head type, shank, point type and shaft diameter. Finishes include, but are not limited to, coating in vinyl, zinc (galvanized, including but not limited to electroplating or hot dipping one or more times), phosphate, cement, and paint.</u> Certain steel nails may have one or more surface finishes. Head styles include, but are not limited to, flat, projection, cupped, oval, brad, headless, double, countersunk, and sinker. Shank styles include, but are not limited to, smooth, barbed, screw threaded, ring shank and fluted. Screw-threaded nails subject to this proceeding are driven using direct force and not by turning the nail using a tool that engages with the head. Point styles include, but are not limited to, diamond, needle, chisel and blunt or no point. Certain steel nails may be sold in bulk, or they may be collated in any manner using any material.
>
> Excluded from the scope of the Orders are certain steel nails packaged in combination with one or more non-subject articles, if the total number of nails of all types, in aggregate regardless of size, is less than 25. If packaged in combination with one or more non-subject articles, certain steel nails remain subject merchandise if the total number of nails of all types, in aggregate regardless of size, is equal to or greater than 25, unless otherwise excluded based on the other exclusions below.
>
> Also excluded from the scope are certain steel nails with a nominal shaft length of one inch or less that are (a) a component of an unassembled article, (b) the total number of nails is sixty (60) or less, and (c) the imported unassembled article falls into one of the following eight groupings: 1) builders' joinery and carpentry of wood that are classifiable as windows, French-windows and their frames; 2) builders' joinery and carpentry of wood that are classifiable as doors and their frames and thresholds; 3) swivel seats with variable height adjustment; 4) seats that are convertible into beds (with the exception of those classifiable as garden seats or camping equipment); 5) seats of cane, osier, bamboo or similar materials; 6) other seats with wooden frames (with the exception of seats of a kind used for aircraft or motor vehicles); 7) furniture (other than seats) of wood (with the exception of i) medical, surgical, dental or veterinary furniture; and ii) barbers' chairs and similar chairs, having rotating as well as both reclining and elevating movements); or 8)

> furniture (other than seats) of materials other than wood, metal, or plastics (e.g., furniture of cane, osier, bamboo or similar materials). The aforementioned imported unassembled articles are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 4418.10, 4418.20, 9401.30, 9401.40, 9401.51, 9401.59, 9401.61, 9401.69, 9403.30, 9403.40, 9403.50, 9403.60, 9403.81 or 9403.89.
>
> Also excluded from the scope of the Orders are steel nails that meet the specifications of Type I, Style 20 nails as identified in Tables 29 through 33 of ASTM Standard F1667 (2013 revision).
>
> Also excluded from the scope of the Orders are nails suitable for use in powder-actuated hand tools, whether or not threaded, which are currently classified under HTSUS subheadings 7317.00.20.00 and 7317.00.30.00.
>
> Also excluded from the scope of the Orders are nails having a case hardness greater than or equal to 50 on the Rockwell Hardness C scale (HRC), a carbon content greater than or equal to 0.5 percent, a round head, a secondary reduced-diameter raised head section, a centered shank, and a smooth symmetrical point, suitable for use in gas-actuated hand tools.
>
> Also excluded from the scope of the Orders are corrugated nails. A corrugated nail is made up of a small strip of corrugated steel with sharp points on one side.
>
> Also excluded from the scope of the Orders are thumb tacks, which are currently classified under HTSUS subheading 7317.00.10.00.
>
> Certain steel nails subject to the Orders are currently classified under HTSUS subheadings 7317.00.55.02, 7317.00.55.03, 7317.00.55.05, 7317.00.55.07, 7317.00.55.08, 7317.00.55.11, 7317.00.55.18, 7317.00.55.19, 7317.00.55.20, 7317.00.55.30, 7317.00.55.40, 7317.00.55.50, 7317.00.55.60, 7317.00.55.70, 7317.00.55.80, 7317.00.55.90, 7317.00.65.30, 7317.00.65.60 and 7317.00.75.00. Certain steel nails subject to the Orders also may be classified under HTSUS subheading 8206.00.00.00 or other HTSUS subheadings.
>
> While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the Orders is dispositive.

Orders (emphasis added).

On August 5, 2016, OMG, an importer of zinc anchors, filed a request with Commerce for a scope ruling that its zinc anchors should be excluded from the scope of the Orders. Scope Ruling Request. In its Scope Ruling Request, OMG described its zinc anchors as follows:

> Each Zinc Anchor consists of two components: (1) a zinc alloy body, which comprises approximately 62% of the total weight of the complete Zinc Anchor; and (2) a zinc plated steel pin, which comprises approximately 38% of the Zinc Anchor's total weight. The zinc body and zinc plated pin are produced in Vietnam, and then assembled together in Vietnam, resulting in a one-piece article of commerce: a Zinc Anchor. While it may be physically possible to separate the zinc body from the steel pin after the Zinc Anchor has been created, disassembly is not commercially realistic, in light of the Zinc Anchor's cost and use, as well as the likelihood that the components will be damaged and rendered useless by the disassembly process.
>
> The zinc body of each Zinc Anchor contributes approximately 74% of the total cost of the Zinc Anchor, while the steel pin contributes 17% of the total cost. The balance of cost, 9%, is comprised of packing materials and assembly labor. While one thousand Zinc Anchors cost approximately $31.50, one thousand subject steel nails similar to the pin mechanically attached to the Zinc Anchor costs approximately $5.30 (i.e., approximately 17% of the total cost).
>
> In order to secure termination bars to concrete or masonry walls, Zinc Anchors are inserted into predrilled holes, which must be a minimum of 1⁄2 [inch] deeper than the Zinc Anchor embedment. The Zinc Anchors are then installed with a hammer, which is used to drive the steel pin, thereby expanding the zinc body in the predrilled hole. The pin facilitates the expansion of the Zinc Anchor in all directions. In other words, the termination bar is secured to a wall by the expanded zinc body. The steel pin is used only to expand the zinc body.

Id. at 3–4.

Following OMG's scope ruling request, Mid Continent submitted comments arguing that OMG's zinc anchors were within the scope of the Orders. Letter from the Bristol Group PLLC to Sec'y Commerce, P.D. 8 (Aug. 16, 2016). OMG filed timely rebuttal comments. Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y Commerce, P.D. 9 (Aug. 24, 2016).

On February 6, 2017, Commerce issued its Final Scope Ruling, in which it determined that OMG's zinc anchors were unambiguously within the scope of the Orders based upon the plain meaning of the Orders and stated that the (k)(1) factors also supported its conclusion. Final Scope Ruling at 10.

OMG filed a complaint with this court contesting the Final Scope Ruling and on June 29, 2017, OMG submitted its Motion for Judgment on the Agency Record and Brief in Support. Compl.; Pl.'s Br. The Government and defendant-intervenor Mid Continent submitted their briefs in opposition on October 30, 2017. Def.'s Br., ECF No. 31; Def.-Inter.'s Br., ECF No. 32. OMG replied on November 30, 2017. Pl.'s Reply. Oral argument was held before this court on May 9, 2018. ECF No. 41. OMG presented the court with samples of its merchandise at oral argument and confirmed that the samples were identical to the merchandise subject to this action. Resp. to Court's Request, May 14, 2018, ECF No. 42. OMG and the Government filed supplemental authority on May 15 and 16, 2018, respectively. ECF Nos. 43–44.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi). The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

## DISCUSSION

The Government argues that: (1) Commerce's determination that OMG's zinc anchors fit within the plain language of the Orders is in accordance with law; (2) there is substantial evidence that the (k)(1) sources dispositively place OMG's product within the scope of the orders; (3) a formal scope inquiry was unnecessary and thus Commerce did not need to consider the (k)(2) sources; and (4) Commerce may instruct CBP to retroactively suspend liquidation on OMG's shipments entered prior to the date of Commerce's ruling. "[T]he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." Meridian, 851 F.3d at 1382. The court concludes that the product

at issue is not a nail within the plain meaning of the word "nail" and is, therefore, outside the scope of the Orders.

As the Federal Circuit has held, the terms of an order govern its scope. Duferco, 296 F.3d at 1097; see Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). Additionally, "[a]lthough the scope of a final order may be clarified, it can not be changed in a way contrary to its terms." Duferco, 296 F.3d at 1097 (quoting Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir. 1990)). For that reason, "if [the scope of an order] is not ambiguous, the plain meaning of the language governs." ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012).

"In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information, including testimony of record." NEC Corp. v. Dep't of Commerce, 23 CIT 727, 731, 74 F. Supp. 2d 1302, 1307 (1999) (quoting Holford USA Ltd. Inc. v. United States, 19 CIT 1486, 1493–94, 912 F. Supp. 555, 561 (1995)). Furthermore, "[b]ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." ArcelorMittal, 694 F.3d at 88.

A nail, as defined by THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE ("AMERICAN HERITAGE") (4th ed. 2000), is "[a] slim, pointed piece of metal hammered into material as a fastener." Similarly, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (UNABRIDGED) ("WEBSTER'S") (1993) defines a nail as "a slender and usually pointed and headed fastener designed for impact insertion." These definitions present a "single clearly defined or stated meaning": a slim, usually pointed object used as a fastener designed for

impact insertion.  Unambiguous, WEBSTER'S (1986), quoted in Meridian, 851 F.3d at 1381 n.7. Therefore, "nail" is an unambiguous term.

The merchandise at issue here does not fit into the above definitions.  OMG described its zinc anchor as: "(1) a zinc alloy body . . . and (2) a zinc plated steel pin."  Scope Ruling Request at 3.  Commerce made its determination based upon the steel pin, arguing "the securely fastening steel nail or 'pin' operates as a critical component of the OMG anchors, without which the anchors could not function as a fastener."  Final Scope Ruling at 10.  As both parties agreed at oral argument, the steel pin fits within the common definition of a nail.  Oral Arg.  However, as Commerce noted in its Final Scope Ruling, and as both parties agreed at oral argument, OMG's zinc anchor is a unitary article of commerce.  Id.; Final Scope Ruling at 4–5.  As such, the entire product, not just a component part, must be defined as a nail to fall within the scope of the orders.

The entire product here is not a nail.  The definitions of a nail cited above define a nail as a fastener inserted by impact into the materials to be fastened.  The merchandise at issue is not inserted by impact into the materials to be fastened.  Rather, OMG's anchors are "inserted into predrilled holes which must be a minimum of 1⁄2 [inch] deeper than the Zinc Anchor embedment." Scope Ruling Request at 4.  A hammer is then used to strike the steel pin, which expands the zinc body into firm contact with the materials to be fastened.  Id.  Nor is the steel pin acting as the primary fastener; rather, the materials are fastened by the expanded zinc body while the steel pin is only used to facilitate expansion.  Id.

Trade usage further supports the conclusion that OMG's zinc anchors are not nails. Multiple industry actors categorize anchors with steel pins as anchors rather than as nails.  Scope Ruling Request at Exs. 5–9.  Where the word "nail" is used in the description of these products, it is used as an explicit or an implicit modifier for the noun "anchor" as in "Hammer Drive Nail-In

Anchors," "Drive Nail Anchors," or "Nail-Ins."  Scope Ruling Request at Ex. 8 (emphases added).  These examples indicate that industry usage accords with the plain meaning of the word "nail."  Thus, according to industry usage, the pin is a nail but the unitary article of commerce is an anchor.

The Government asserts that Commerce "considered how the language of the orders is used in the relevant industry and [found] the language and marketing of masonry anchors is not dissimilar to the variety of nails marketed in different categories."  Def.'s Br. at 13–14 (quoting Final Scope Ruling at 10).  However, neither Commerce in its Final Scope Ruling nor the Government in its brief furnished support for this proposition.

Therefore, OMG's zinc anchor, taken as a unitary article of commerce, is not a nail within that word's plain meaning and thus does not fall within the unambiguous scope of the Orders.

## CONCLUSION

The court remands to Commerce for further consideration consistent with this opinion.  Commerce shall issue appropriate instruction to U.S. Customs and Border Protection regarding the retroactive suspension of liquidation.  Commerce shall file with the Court and provide to the parties a revised scope determination within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination to the Court and the parties shall have 15 days thereafter to file reply briefs with the Court.

SO ORDERED.

/s/  Gary S. Katzmann
Gary S. Katzmann, Judge

Dated: May 29, 2018
New York, New York